Our final case for this morning is United States v. Terzakis. Mr. Brindley. May it please the Court. Mr. Terzakis appeals the District Court's denial of the motion for attorney's fees pursuant to the Hyde Amendment. Perhaps the principal issue to discuss is whether the District Court erred when determining what standard to use to evaluate whether or not this was a frivolous or vexatious action by the government. We believe that the District Court made a mistake of law. What the District Court said unequivocally was that to be vexatious or frivolous, either one, the defendant must first prove at least that the government's action was baseless. Well, look, any of the three would do to deny the attorney's fees under the Hyde Amendment. And baselessness certainly is a feature of frivolousness. I'll stick with that for the moment. And the District Court, I thought, actually gave a pretty good and thorough account of why the government's intended prosecution didn't sink to that level. The government got a grand jury to indict even without Nick Ventrella's testimony. There were bank records. There were other things. They chose for their own good reasons not to go forward without Nick's testimony. But I'm not sure I would call it baseless. And, Judge, I think our point is it doesn't have to be baseless. We think the judge made a mistake to say to be frivolous, baselessness is required. In the Third and the Sixth Circuit. What do you think frivolous means? The Third and the Sixth Circuit have said that it's enough to establish frivolousness if you can show that the government did not, was, did not have a reasonable belief that it would be able to prevail in the case. What's the difference? I'll tell you the difference. You can have a case where the government has a reasonable suspicion, where the government has a basis, where the government's looked at some records that tells them they want to try to proceed. But they reach a point in that case where they know that they cannot reasonably succeed. And when they reach that point, if they continue, it's argued that that meets the definition of frivolousness in the Third and Sixth Circuit cases that we've cited. And I think that's different than saying it's baseless. Baseless is there's no good reason to begin with. You could look at the bank records that Judge Wood was talking about and say, well, the bank records give us reason to pursue this. But in the end, we cannot, we cannot succeed without the testimony of Nick Mintrell. And they, when they reached that point, they dropped it. No, they didn't. They knew that in October. They tried to reach a deal, right? They tried to reach a deal with him. Right, but I don't think that's good enough. In fact, I think that's worse. Why is that worse? I mean, you know, they have all this other evidence. They actually have conversations with Nick suggesting that, and they say in those conversations he was able to be responsive. He was a person who had some problems. We both, we all understand that. But they spend a little bit of time seeing if we can get a break. Maybe they're still deciding, you know, we're going to go forward. They've got money that this, or sort of evidence that this money from the Illinois area was being siphoned off to California to support the Ponzi scheme for a while. Seems like they've, this is some distance from frivolous no matter whose definition you choose. In October of 2015, they knew that Nick Ventrella wasn't going to be able to testify. They knew he was dying. And I think it is important to note that what they didn't do at that time was say, you know what, we should get him in and do a video deposition, which is done all the time when you have a very ill witness. They knew then that this man could never testify. If they thought he was credible, they would have preserved his testimony. They may have been weighing for some time whether the rest of the evidence, which was enough to persuade the grand jury to indict, might have done the job. And now, I mean, you know, they come to the conclusion, maybe because Terzakis by that time is already in prison. I don't know. I mean, it's none of my business. But they come to the conclusion it's best to drop. The other thing that I think is important to note when considering the frivolousness potentially of this action is the fact that in the government's response brief here, they noted that when they interviewed Ventrella, Ventrella told them that he didn't know anything about any of these transfers or transactions to this Milwaukee account that all of the charges stem from. They said he told them he didn't know about those things. But in the indictment, Terzakis is expressly charged with having talked to him about and lied to him about those transactions, which the government now says Ventrella told them he didn't know anything about. But why isn't that consistent with Terzakis having a conversation with Nick Ventrella that just doesn't sink in? I mean, you know, it seems to me that could happen with an autistic person. That might be able to happen, but there's no evidence whatsoever in the record that it did. In this instance, what we know is that the government was told that Ventrella didn't know about these things. The government indicted Terzakis for having lied to Ventrella. The government acknowledges that they can't prove this case. The only evidence, and the only evidence about Terzakis' dishonesty was Ventrella. And the government, as of October 2015, at the very least, knew Ventrella wouldn't testify. And it is our view that at that point, proceeding forward and trying to say, well, let's see if we can get this guy to plead guilty anyway, even though we know we'll never prove this case. When you say, that seems worse to me, because it seems like exploiting the situation unfairly because you know something that they don't. Is a witness's absence or unavailability exculpatory? Is it treated as Brady material? In this instance, I think it would definitely be. More generally. More generally, I think it depends on the specifics. I don't think I could say that it has to, but if it's a witness in this instance who has a particular, he's dying of a brain tumor, yes, that's going to affect everything that this witness has said and this witness's ability to be. I think it's tactically useful, but it's not. Well, I think that would be Brady material. If you know that one of your witnesses, your essential witness, is suffering from a cognitive, it's a giglio. That's going to, you might want, you're going to want to get a psychiatric analysis. Well, they've got that. The defense has that. Right. Okay. Speaking of that evidence, you all criticized in your brief, you criticized the district judge for not addressing Dr. Cohn's report. Yes. Saying its importance can't be overstated. Yes. The government says it was first presented in the reply brief. Yes. If its importance can't be overstated, how could it not have been presented originally? It certainly could have been presented originally, if that's the question, but I think the answer is that after reviewing the government's response and the position that they were taking with respect to the first doctor's report, then including the second one as corroborative, in fact, providing even more information about how this would affect it, that it's not going to get better, that it's going to get worse. I just find it hard to believe its importance can't be overstated if it's left out. Well, that language may have not been the best language that's ever been drafted. No, Dr. Cohn never met Nick. No. Never saw him. No, Dr. Cohn... Just read Levin's report. He saw him once. Right. Levin saw him not as anything related to this. Levin saw him when they were trying to evaluate whether or not he had the capacity to be a trustee or whatever his position was, and they gave that report to the FBI, and that report did suggest this person had terrible, terrible cognitive problems, if that report's accurate. Mr. Brinley, are you looking for attorneys fees between October and December? Potentially, sure. Not potentially. I'm asking you, is that the focus? I know. When the government informs you, or informs the... The lawyer, yes. And the December is the dismissal. Yes. So is that what we're talking about, the attorneys fees for that period of time when the government didn't dismiss the same day that they informed you of the diagnosis? No. I'm saying at the very least, at that point, they knew for sure. It's our view they knew much earlier based on the doctor's report and based on the brothers who had gone in and said, this guy isn't capable of managing these funds. He doesn't have that capability. That's why they got the first doctor's report in the first place, and they turned it over to the... The government has a cooperating witness, going to cooperate, not cooperate, gets close to trial, may cooperate, finally doesn't cooperate. Yes. Okay. So when is the government responsible for realizing that their cooperating witness is not going to testify, and so they have to dismiss the indictment? I think it depends on what the cooperating witness is saying that... Well, I'm giving you an example of... I think I need more specifics in the example. Well, the specifics are, as you know, you're an experienced defense lawyer. Yes, I am. A cooperating witness seems to be, for whatever reason, dropping charges, lessening charges, agrees to be testified for the government, and they're central to the potential conviction. Yes. But they waiver over the course of the seven months until the trial occurs. I'm just making a... If they make... I guess here's an answer. If they make a statement, and I think the government actually does this, if the cooperating witness makes a statement suggesting that they may not cooperate, I think at that point the government needs to turn that over, that they know that that's an issue, and I think they often do in those circumstances. So I'm not sure if that answers the question, but I think they should do that at that point. Well, I'm just trying to get into where the government... where we should inquire into when the government has made an assessment that a case can't go forward. I think if there's evidence in the record that establishes that the government knew from an early stage that they were not going to be likely to succeed, they might have thought that the defendant did something, they might have believed there was some evidence, so it's not baseless as I said, but thinks ultimately we're not going to be able to proceed unless we can convince the guy to take a deal, and they knew that early on as I think they did in this case. I think at that point they should be held responsible when that is ultimately dismissed and that person comes back and makes his claim for fees. So with that, I'm out of time here. We'd request that the case be remanded for consideration under the understandard and a hearing on it. Thank you. All right, thank you. Ms. Bonamici. I may have pleased the court. Good morning. Deborah Bonamici on behalf of the United States. Your Honor, the district court did not abuse its discretion in denying an award of fees in this case because the defendant did not come close to meeting his burden of establishing that the position taken by the government was vexatious, frivolous, or in bad faith. To the contrary, the evidence supported, as it turned out, the evidence did not bear out any of the claims made by the defendant in support of his motion. There was not a large volume of evidence showing the development of the property as he had claimed. First of all, with respect to building, there was no building ever done on the property. The district judge makes a comment to that effect, right? She says, as far as she can tell, nothing has happened. Nothing had happened, and with respect to the engineering costs and other items reflected in the massive documents submitted by the defendant, those documents demonstrate that the expenses that were undertaken were not undertaken during the period in which the defendant was siphoning off money and diverting it to his own purposes. So the government's evidence traces it from Berenice Ventrella's accounts to the accounts of the estate, to the jointly held account, to his personal accounts. Correct. You've got all that, at least you've got that far. And actually, does the evidence also show some of the transfers to California? Exactly. Exactly. After the funds were diverted to the personal accounts owned and controlled solely by the defendant, a large quantity of those funds were used to pay off victims of the Ponzi scheme in California  was used as a basis to reduce the defendant's prison time in that case. So that is exactly the way that it was traced. And in fact, the underlying basis of this entire case, the documentary evidence, substantially showed the systematic diversion of funds by the defendant, including the final use of some of the funds, a large portion of the funds, for his own purposes. And in fact, the defendant in his proffer statement to the government admitted part of that, including the fact that he had used some of the money to pay off his victims in the Ponzi scheme. The evidence also did not bear out the claim that there was compelling evidence to establish that the money that the defendant took constituted bona fide loans. To the contrary, the evidence contained no loan documents, promissory notes, or anything else signed by any family member or any trustee, no evidence whatsoever that there was an agreement on the lender's side to provide a loan, nor was there any evidence whatsoever of a legally binding, unconditional agreement to repay on the part of the defendant, which, of course, is the hallmark of a bona fide loan. So let me ask you this. I'm sort of jumping to the next level. The Hyde Amendment says that this fee shift can happen, that the government can pay, if any of three things is possible. And you're defending the district court's judgment largely by saying, well, it was a well-founded prosecution, so it couldn't have been any of the three, frivolous, malicious, or vexatious. And Mr. Brindley's focusing on, as I understand it, sort of a more granular definition of each of those terms. Do we need to worry about that here? The government does not believe you need to worry about that in this case. There may be a case one day where the fine distinctions between those terms make a difference, but they don't here. And they don't here for a couple of reasons. One, because the district court is correct when she says that, in reality, these definitions do have some overlap. I mean, that's just a matter of fact. And number two, the government's conduct in this case at no time fulfilled any possible definition of any of those terms. And there's certainly no evidence. Even during the time after it was pretty clear that Nick was mortally ill and the government is still talking to Mr. Terzakis about a possible plea deal? Absolutely not. And, by the way, that information was provided to Mr. Terzakis's counsel, and this was a two-way discussion. In fact, the case was scheduled for a change of plea, which was undone on the day of the change or just before that, and then the decision was made to dismiss. And that reflects the fact that there was a mountain of evidentiary evidence and other evidence to support the government's claim. And to be clear about the indictment, which, I mean, I'm sure your honors have the indictment and you can see for yourself, but just to be clear, the suggestion that there was a direct tie between the statements that Nick made about being told how money was going to be used, those related to the transfers from the original bank accounts and the consolidation of funds into, ultimately, the account held by the LLC. It did not apply to the transfers from that account to the defendant's personal accounts or to the defendant's use of the funds for other purposes. I mean, what we see here is a funneling, an intentional funneling by the defendant and diversion to his own use. And what Nick understood had to do with going from bank to bank to close bank accounts and consolidate them. So there's not a direct connection there. And the same thing applies to the argument the defendant makes about Nick having no information about the wire transfers. The charge wire transfers all involve transfers to Terzakis' personally owned accounts. And so it's just an invalid argument. It's not based on the facts or on the charges. Let me ask you a question. After informing defense counsel of the cancer diagnosis in October, are their plea negotiations still continuing? Yes, they continued after that. And the record reflects that during that period the government was, in fact, considering whether to preserve Nick's testimony in a Rule 15 deposition and also considering whether the other evidence would be sufficient to go forward. I didn't hear that. And also considering whether the other evidence would be. Justify proceeding? Exactly, exactly. I mean, what you have here, rather than vexatiousness, you have appropriate prosecutorial conduct in trying to hold accountable a serial fraudster who the evidence shows has taken advantage of a very vulnerable family. I mean, nothing could be further from the truth in this case. But with respect to the plea agreement, the evidence shows all the transcripts of the status hearings and everything else that are part of the record demonstrate that defense counsel and the government took months and months to go through the voluminous records that were obtained in this case and produced in discovery. And those records quite clearly demonstrated what we've been talking about, evidence of the siphoning off of the funds. And there was no evidence establishing that that was justified legally in any possible way. And there were no witnesses, no family members, no lawyers, no witnesses who corroborated the defendant's statements, which in themselves varied on multiple occasions. The description of what happened and the loans changed as the investigator stood there and watched him talk in a single interview. I mean, it just was not credible. But I'm understanding you to be saying that his theory, that the government strings him along trying to get a plea, even as the government realizes how ill Nick is, doesn't hold together because Mr. Terzakis' representatives also knew that Nick was. No, I'm saying it doesn't hold together. There's no evidence that the government was motivated by a belief that, or by some unfair belief that we thought that we had nothing, but we still tried to extract a plea. There's just no evidence of that whatsoever. But you agree that he didn't, that Mr. Terzakis didn't realize that Nick was on the verge of death, or did he? He did. I mean, as soon as we got the information, we immediately disclosed to the defense. And the other thing that corroborated the government's view of Nick was the defendant's own dealings with Nick. I mean, his willingness to put Nick in a position of being a trustee with help, descriptions of other witnesses of Nick's mental state, which one of the lawyers referred to him colloquially as an idiot savant who had this incredible memory of all the bank accounts and who was quite capable of paying all the bills on the estate's massive real estate holdings. Ms. Bonamici, why did this case languish for two and a half years? A good part of it, based on my reading of the record of the status hearings, had to do with, at least more than a year of it, had to do with the defense counsel's need to go through the voluminous records. Go through the records. That was a big part of it, and time was excluded on that basis. There was a change of counsel early on, and after that, the new counsel, the counsel who handled this up until about a week ago, went through the records and requested several continuances in order to do that, and then there were plea negotiations. And there's a debate about what was discussed among the various lawyers. I think there's some confusion about who was involved in the discussions with respect to the global agreement, but there was an effort to bring this to a plea agreement. I mean, it's not unclear that many of the government's witnesses had warts, and it was going to be a difficult and time-consuming case to try, and it was not inappropriate to seek a plea agreement in this case. Given all of the record and the district court's thoughtful, careful opinion, which we think is the opposite of an abuse of discretion, we would ask that the court affirm the district court's ruling in this case. All right, thank you. Your time ran out, Mr. Brindley, but if you have really one minute, I'll give it to you, not more. One thing I'll say to conclude here is I think it's important, going back to the frivolous definition as the Third and Sixth Circuits have elucidated it, to note that the government could come into a case with a reason to prosecute, or even a good faith basis to begin, and at some point along the way they could reach a point where they knew they couldn't possibly win that case. And if they continue on to try to get the defendant to plead guilty after that, I think that does qualify as frivolous. I think that does satisfy exactly the type of thing that the Hyde Amendment was meant to respond to, and I think that's the situation in this case. Okay. Thank you. Thank you very much. Thanks to both counsel. We'll take the case under advisement. The court will be in recess.